The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Please be seated. Proceeding now in the case of Gerold Berghoff v. Chesapeake Appalachia, LLC. Mr. McGraw. Thank you, Your Honors. May it please the Court, Counsel, my name is Jeremy McGraw here on behalf of the appellants Gerold and Bonnie Berghoff. It is an honor to be here before the 4th Circuit today, so thank you for the opportunity to appear. We have pursued this appeal because we believe that the rule of law in West Virginia and really every state entitles every party to a contract to expect and rely on the fact that the other parties to that contract will live up to the terms of the contract if they want that contract to be enforced. And what we're dealing with in this case is an oil and gas lease agreement which was signed back in November of 2006 by my client, Mr. Berghoff, with another company which is not actually a party to the case anymore, which is now held by Southwestern, but during the operable time, Chesapeake was the company operating the lease. The issue in the case is whether or not Chesapeake had done enough or followed along with the terms of the agreement in such a fashion that the lease would extend beyond what they call the initial five-year primary term, which is a definite term of the lease, into what is an indefinite secondary term which allows them to continue to hold on to the property for decades and decades to come. It's our position that they did not follow through with the specific requirements of the lease agreement in order to do that. The initial clause that talks about these issues and how you extend a lease beyond the primary term and into the secondary term is what they call the Habendum Clause, and it's paragraph 2 in the lease agreement in this case. It talks about there being a five-year term. During that initial five-year term, the company really doesn't have to do anything. They're paying their rent. They're keeping up with their payments. As long as they're doing that, there's no required operations or anything like that. To go beyond that initial definite primary term into this indefinite secondary term, the Habendum Clause required there to be actual production of gas, the capability of producing gas, and our position that the actual search for oil and gas, which requires something physical and concrete rather than merely doing paperwork type things. Search or searching? Search. It says operate and search for oil and gas, I believe is what the lease agreement says there in the Habendum Clause, which I think is important because some of the cases… Search as a noun or search as a verb? I would say search as a verb in that context because it requires actual physical operations by my view. So searching means you have to be searching for it. It is not a search you've conducted. The language of the lease does say operate in the search for, and I believe in the context of using that language in the search for, search would be searching the actual physical operations which would require the action. One of the issues in this case being… Does searching have to be physically on the property, or could it be done on an adjacent piece of property? The searching could be done on an adjacent property so long as the pooling provision, which is another paragraph in the lease which kind of joins in with the Habendum Clause. Let's talk about searching first because we're dealing with operating. If it's operating, and here the question is whether or not it was operating at that time. And so when you put a well on the adjacent property, if the intent, which seems to be pretty clear, is to go on to the subject property, is that not searching? I do not believe it's searching in the context of this lease agreement which required the actual operations and production to be from the property at the end of the Habendum Clause. And the only way you get to being able to use the search that could be going on the other property is by effectively going through the pooling clause and meeting the requirements of what that clause required to allow you to connect your property to the property that it is being pooled with. Okay, now Judge Bailey said that there was substantial compliance with the requirements. And what you're saying is that that's an equitable concept that doesn't come into play because you're interpreting a legal document, is that correct? Yes, it's our position that under McCullough and the cases in West Virginia, when you're looking at the Habendum Clause, you've got definite things that need to happen. If those things don't happen, the lease automatically terminates of its own right. So the lease terminated, our position is in 2011 when the five-year window was up. There's nothing equitable to reform at that point, so you're not looking at an equitable form of relief. Is there at least a factual dispute as to whether or not your client acted reasonably in denying the access road for the building up of the well pad during that five-year term? I think the factual dispute is the best that can be said of that argument at that point. The addendum to the oil and gas lease agreement included a site selection clause, which did have some language about not unreasonably withholding your consent. I think that there's a big factual question in this case as to whether or not Chesapeake was ever going to move forward with the well on that property and whether or not Mr. Burghoff's position of I don't want the road there was actually the reason why they left the property and went somewhere else. So let me make sure I understand. So you're saying then that if we agree with you that the notice was a requirement of the lease that was not met in this case, you're entitled to reversal, but you are not entitled to summary judgment. You're entitled to go back to have the factual matters that are disputed resolved by a finder of fact. Is that correct? I do believe since it was Judge Bailey's finding that there had been unreasonable activities on Mr. Burghoff's place, the only way we can go back at that point is to more determination of those issues, that it would not necessarily result in summary judgment. So the resolution of the legal issue of notice does not resolve the factual dispute? I do not believe it does in this case, Your Honor, because when we spoke to the landman in this case through depositions and their testimony is in the record, they really couldn't say anything about how far this process had gone on with regard to the property there. So I think that there definitely is a factual question as to whether or not Mr. Burghoff did anything unreasonable in enforcing his rights to site selection. I think that's one of the issues in this case is, you know, are companies, these companies allowed to just do whatever they want to do, say close enough is good enough, but then turn around and say, no, the landowner can't comply and can't enforce the provisions of the lease agreement. All right, but Judge Bailey seemed to, he characterized Mr. Burghoff's objection as unreasonable. The only testimony on that was... What was the testimony on which Judge Bailey made that finding? There was questioning during Mr. Burghoff's deposition, and it was cited by the appellees in their brief, where Mr. Burghoff indicated he did not object to the well pad itself location, he had an objection to where the road was going to be. The Chesapeake individuals told him that there would be environmental issues because there was a waterway or something along those lines where he wanted to go and they couldn't do it. Well, Mr. Burghoff adhered to his standard that he wanted his site approval to be taken into account. Chesapeake said, well, do whatever we want, and that was really the end of it. That's really the only evidence on that issue came from Mr. Burghoff. But the judge didn't put that in his opinion, did he not, that it was unreasonable? He did put it in his opinion that it was unreasonable, and I think he reached too far in getting to that point without allowing fact-finding on that issue to determine whether or not that was going to be the case. Now, I think maybe Judge Bailey decided that it didn't matter whether or not that occurred because he agreed that the pooling notice was enough, so perhaps that's why he didn't explain a little more in his brief. But either way, I think that issue would have to come back to the district court for further examination. The Abandonment Clause provides for an extension, if the premises shall be operated by the lessee in the search for oil, gas, and et cetera. If that is shown, do we even reach the question of pooling? If the actual property is being operated in the search of oil and gas, then no, you do not reach the pooling. I understand your use of the term actual property, but to the extent that you place a well on adjacent property, you give at least constructive notice by filing that it is going to affect the subject property here, and all of the indication is that the purpose is to affect the subject property. Why is that not operating in search of oil and gas on the subject property? If that was the case, there would be no need for the other pooling requirements to say this is what you have to do to be able to use operational properties. The point is that you don't get to the pooling if it is being operated in the search for oil and gas. You don't even get to that question. I think part of this goes to – I think you could – Let's resolve. At least I'll understand that. That is true. That's a separate – because the pooling part is another sort of a separate part, I guess assuming you don't – you're not operating it. You're pooling, you're putting the properties, dealing with something totally different. But to extend it, all you need to be doing is operating by the lessee in search for oil, gas, et cetera. Those operations had not occurred by the time the end of the lease expired. The well that ultimately would reach the Berghoff property was not even begun to be drilled until December of 2011. On the Berghoff property, Chesapeake put survey stakes in the ground. Is that correct? Yes, they did. For the well pad? Yes. And they did the survey, and then they, according to the survey, put stakes in the ground. Why wasn't that enough to constitute the contractual provision of searching for oil, gas? Are you saying because they abandoned that? They abandoned that plan, and we're not really sure when that even occurred. It was some point prior to the end of the lease. It was sometime in 2011. Probably sometime in 2011. Again, that testimony comes from Mr. Berghoff that that was initially occurring. Chris Branch, a land man for Chesapeake, testified that they go out and stake some properties and do so many things that it really doesn't become serious. There was really no documents in their files when we asked for their lease files even showing that they had done those operations. So what are you saying, then, that the Habendum Clause and the requirement of searching is measured as of the date that the lease expires? As of the date the lease expires. You have to be in the search for gas, having producing gas, or being capable of producing gas. Our position being you can only be capable of producing gas if there's an actual well on the property, which that issue has not been addressed in West Virginia, but there are courts in Ohio in the gas-producing area that have said that same thing. If you don't have a well, you can't be capable of producing gas at that point. But there are other cases that say a lot less is required. There are cases that say a lot less is required. There's one case in West Virginia, the Fleming case, that talks about commencing operations. I think the difference there being the commencement of operations versus operate in search of and actually applying the language of the lease agreement itself to determine what the company is going to have to do to be able to extend that lease agreement beyond that definite primary term and into the indefinite secondary term. You don't maintain commencement of operation in how it was used in Fleming as is applicable here. No, I don't believe it is because this lease doesn't even use the word commence. This lease uses operate in search of, and our focus is on the word search. Using the word search as its general common dictionary definition, it requires something more physical than just filing some paperwork. It requires the actual drilling and well work, which in this case, the drilling did not begin until December of 2011 per Chesapeake's own reports to the West Virginia Department of Environmental Protection. Mr. McGraw, why isn't the absence of the filing of the notice in this case, with respect to the extension of the lease, subject to showing prejudice by your client? The reason I argued that you didn't have to look at the harm is because substantial performance should not even apply to this case. You're only looking at weighing the benefit and the balances, the harms, if you're actually applying the equitable remedy of substantial performance. If substantial performance does not apply, you don't look at the harm. If you are going to look at the harm, you have to look that there was actual harm to the Burgos. The Burgos had signed this lease back in 2006, when a lot of people were getting thrown a lease agreement signed at them that nobody really understood. When 2011 came around, they were expecting and understood that they'd get a chance to renegotiate a lease if there had been no operations. Their harm is that they were then prevented from going out and reaching into the market again and negotiating a new agreement, whether it be with Chesapeake or someone else, to offer more beneficial terms to them that they would have appreciated to have. Now, I think the fact that Chesapeake did come to the Burgos in 2011 and attempt to negotiate a lease agreement is at least an inference that Chesapeake itself knew it had not and could not do enough to hold onto the property prior to the end of the primary term. Why else would they be coming back to the Burgos at that point and attempting to negotiate a new agreement, even if they're only trying to extend it for another year or so? So I believe that the inference most favorable to us on that piece of evidence would be that Chesapeake itself knew that they had not done enough and could not do enough to extend this lease into that indefinite secondary term. Going back to this operations question I'd asked earlier, am I understanding you to say that because they were not, in fact, pumping gas or oil from it, that's not operations or in search of gas? I'm saying that the term operate in search of requires the actual drilling of the property, not just filing of documents saying we're going to do this in the future. Operate in search of means actual operations on this adjacent property. They had, in fact, undertaken steps and were in the process of doing all that. Those, I don't think that those initial, like the clearing of the site, creating the pad can be attributed to this well property at that point because that was under a completely different permit that was never intended to reach the Burghoff property. Even the well that ultimately did reach the Burghoff property up until October, November, right before the lease was set to expire, was never intended to actually reach the Burghoff property. It was going to stop short of the Burghoff property. So most, if not all, of the preparatory work that happened on the well pad itself was designated related to the 3H well, which when a different direction is in a different unit does not affect the Burghoff property at all. So I don't believe that those operations would be sufficient, but also I don't think you get into the preparatory issue because we're not talking about the commencement of operations in this case like you would be in Fleming or Henry, the case they cited from Ohio. You're talking about actually operating in search of oil and gas, not just commencing the operations for oil and gas. That's my time.  Thank you, Your Honors. Thank you, sir. Mr. Liban? Am I pronouncing that right? It's Liban. Liban. Either way works, Your Honor. I knew I had a 50-50 shot. I've heard them all. I apologize. I've heard them all. Good morning, and may it please the Court. My name is Luke Liban. I'm here from Pittsburgh. I represent one of the co-defendant appellees in this case, Chesapeake Appalachia LLC, and I'm arguing today on behalf of both Chesapeake and our other co-defendant appellee, SWN Production Company. Would you begin by addressing the point that your opponent just made regarding operations, whether there were preparations for search of gas and oil on this adjacent property, and the fact that no actual drilling had occurred, it could not have been? Absolutely, Your Honor. I think that's a great place to begin. I think when you're talking about—the thing to back up and start with is that we're talking about an oil and gas lease. It's a contract, just like any other contract that might come before the Court, and so the place to start is the language of that contract. So what did this lease say? It said it was going to remain in effect until November of 2011, and as long thereafter as the premises shall be operated by the lessee in the search for oil or gas. So we need to look at all of those words, and operations has a very specific defined definition under West Virginia law. It comes from the Fleming case, and counsel's absolutely right that the Fleming case, what the lease said, is that the lessee needed to commence operations for a test well within one year. And so there's two important things from Fleming there. First, it deals with operations, just like our case dealt with operations. But second, what was required in Fleming wasn't just searching for oil and gas. What was required in Fleming was commencing operations for an actual well. So what the Court said in Fleming is it went through all the activity. In Fleming they're talking about operations. Here you're talking about operating. The language from our lease says operated. The language from Fleming says operations. Your Honor, I don't think that there is a material difference between those two different forms of those words. It's a noun as opposed to a verb. It's telling you you're doing something as opposed to it being in place. Well, I think in Fleming it talked about commencing operations, so commencing something. Here it talks about operated, so operating something. The thing to take away from Fleming is that it provides this Court an exact definition of what operations is, even apart from commence. So in Fleming the Court held that the lease was going to be extended, this is the quote, no matter how slight may have been the commencement of any portion of the work which was a necessary and indispensable part of the work required. So that quote uses the word commencement, and what comes after it in Fleming is how West Virginia defines operations. Any portion of the work which was a necessary and indispensable part of the work required. Okay, so what was being done to meet that definition on the Berghoff property on the last day in November? So there are a number of things that were taking place at that time. No, on the Berghoff property, not on the Poole property. Physically on the Berghoff property? First of all, Your Honor, there is no law that I am aware of which says that when we measure it is the very day, November 27th. The way courts look at this is what is going on and is it a continuing process. Okay, but there was nothing going on on the Berghoff property. They had had it surveyed. They had staked the well pad. You agree factually there was nothing else going on that they had sort of moved on to the next door property and were going to access the gas in a different manner? I don't agree with that, Your Honor. No? Why not? What was going on on the Berghoff property was that prior to the expiration of the primary term, Chesapeake applied for and received approval to case the 8H well. The 8H well runs directly underneath the Berghoff property. You cannot drill a well in West Virginia until you have your casing approved by the West Virginia Department of Environmental Protection. So that is work, which is a necessary and indispensable part of drilling a well. Additionally, Chesapeake applied for and received the well work permit for the 8H well. For the remotely accessed. No, Your Honor. That 8H well is directly underneath the Berghoff property. I think what might be helpful. Where was it going to enter the ground? It wasn't going to enter the ground on the Berghoff property. That's correct. So it enters from the well pad on the Rogers property. You're saying that doesn't make any difference. It doesn't make any difference at all, Your Honor, because The trial court didn't seem to, wasn't really relying on this argument that you're making now. No, I don't think that's Bailey pretty much said, hey, this case is over because there was substantial compliance. There was a notice. Excuse me, there was no notice, but didn't really matter. And case closed. He said they unreasonably withheld their consent. The Berghoffs did. And it seems to me we've arguably have an error of law that we've got to address before we start talking about how moving in from the pooled property to access the Berghoffs gas. A few things, Your Honor. I would characterize Judge Bailey's decision a little bit differently. I do think he talked about operations that physically took place on the Berghoff property in terms of the well pad that was going to be placed there. And then he talked about Mr. Berghoff's actions and whether or not that was reasonable. The other thing I would say, Your Honor, is as this court is aware, you can affirm based on any basis in the record. And what we see in the record, undisputed in the record, is that prior to the expiration of the primary term, there were actions taken necessary to drill a well which goes directly beneath the Berghoff property. So then are you agreeing that there was no basis to employ equitable concepts such as substantial compliance when there is a legally enforceable contract between the parties? Do you agree as to that? Absolutely not, Your Honor. I don't. I don't agree with that idea in this context. Why? Because, Your Honor, I think there is a West Virginia court that deals with exactly that. There's a West Virginia case that deals with exactly the issue that we're looking at right now. It's the Eastern Oil case. What happened in Eastern Oil is that there was an oil and gas lease which required production in the primary term. A well was drilled in the primary term, but due to a number of different factors, one of which was lessor interference, the well did not produce in the primary term. It couldn't start producing until after the primary term. And so the court addressed kind of what had happened. The claim was the exact same claim here. The lessor said, You've got to produce before the end of the primary term. You didn't produce before the end of the primary term, so the lease expires. Right. So you're saying that this is a similar case because the lessor was rendering the property unable to be developed? I'm not, Your Honor, because the Supreme Court of Appeals in Eastern Oil actually states its holding and says, Even if we disregard the interference, the quote is, Could you give me a page number for that? I could not give you a page number, but I can give you the exact quote. I apologize, Your Honor. So the court addresses the interference, but it also states that even, here's where the quote starts, If he had not so interfered and the well could not have been drilled within the time, are there no principles available to a court of equity upon which, this is a lessee, can be relieved from the gross injustice which a lessor seeks to inflict upon it? And then the court answers its own question. It says where there has been a substantial compliance with the contract and gross injustice would be inflicted, relief should be granted. So the gross injustice was because of the lessor's interference? No, Your Honor. I don't think so, Your Honor. I think the gross injustice here would be reading into the lease a requirement that the DPU, the declaration of pooled unit, not only had to be mailed, but had to be mailed by a specific time when the lease doesn't make any kind of requirement like that. All the lease says is you've got to record and you've got to mail. It doesn't say anything about when that mailing needs to take place. I mean, you could reasonably read that to require that as a precondition for exercising the right of pooling. Why isn't that reasonable in this context? Because it doesn't say that, Judge. There's just simply nothing in the lease which says you have to record and you have to pool, or excuse me, that you have to record and you have to mail prior to the expiration of the primary term. What that provision says is you've got to make the declaration with the same formality that you did with the lease. There's no dispute about that. What it also says is you've got to record. There's no dispute about that. But the predecessor statement is that the lessee shall effect that consolidation by doing those things. So why isn't that a precondition? It says that that is when the consolidation is going to happen. So there's no consolidation until there's a mailing, right? No. Until the contract. Why not? Because the lease doesn't specifically say this is when it needs to be mailed by. The lease just says this is what shall be done. The consolidation shall take place. Essentially, it shall effect such consolidation by, one, executing the declaration and recording it, and, two, by mailing a copy. They didn't mail it. So I think, well, it was mailed, Your Honor. It was not mailed. Well, a year and a half or a year plus late. It was not mailed prior to. Everybody admits it wasn't timely mailed. That's, well, I think we only admit it wasn't timely mailed if there's a requirement in the lease that says this is the time by which it needs to be mailed. I would agree there's nothing in the record. Everybody agrees that the notice was not mailed within the lease period. Within the primary term. Absolutely, Your Honor. I don't think there's a dispute there. I think, and I think we got down this road a little bit because some, I think, Judge Keenan, you asked me about the injustice that would be here, right? And so one of the things we talk about is let's look at all the stuff that took place here. Not only did they go on to the Burghoff property. Once they couldn't be on the Burghoff property, they went next door. They got all the permit work they needed to do to build a pad. They constructed and physically built the pad. They got all the permit work they needed to do for the well which goes underneath the Burghoff property. All of that, all of that took place prior to the end of the primary term. So if we want to talk about injustice, what we're going to get to is all of this work done here and then because this mailing did not occur, this second form of notice, right? because this second form of notice did not occur allegedly timely. They shouldn't have agreed to it in the contract then, should they? Well, I don't think they did agree to it in the contract, Judge, because I don't think that provision says that. Additionally, what does it say then? What does it require? What does the contract require regarding notice? What the contract requires regarding notice is that you have to file and record the DPU. That was done, excuse me, the declaration of cold unit. That was done and it was November 15th. I think it was about two weeks before the expiration of the primary term. It also says you have to mail the DPU. The DPU is mailed. And so that is our position on the things that have taken place here. But I think even if we step away, what the Supreme Court of Appeals said in Eastern Oil is that in this instance, we can talk about the idea of substantial performance. Wasn't Eastern Oil a case where there was an ongoing well on the property? And so the interference was of a different nature. It wasn't somebody just saying this isn't the place to put the road. In Eastern Oil, they had the operation that was physically in place. There's absolutely a difference in the facts between Eastern Oil and these things. So it was interference by the owner, the lessor, with the existing operation that was already producing oil. I think there's two things, Your Honor. First of all, the reason there was more kind of activity on the lease in Eastern Oil is because the Eastern Oil lease required more. The Eastern Oil lease says you have to produce. Our lease only says you have to be operations in the search for gas. That's why my point only, Mr. Levin, is that I don't see how you can argue that Eastern Oil is totally controlling this case when the parties have a contract. Isn't really the issue whether the contract was satisfied? Absolutely. That is the issue, whether the contract was satisfied. What the district court said is here there was substantial performance of the contract. The reason I'm talking about Eastern Oil is because it applies the doctrine of substantial performance to a claim that a lease has expired. And so we see, you know, what counsel talked about at the end of his argument was substantial performance doesn't apply here. Equitable principles don't apply here. None of that applies here. But what we see in Eastern Oil, a case where the plaintiff said this lease expired at the end of its primary term, is we see the Supreme Court of Appeals apply the doctrine of substantial performance. That's why Eastern Oil is important here. Not necessarily because of the facts or anything like that, but the legal idea that the West Virginia Supreme Court of Appeals applied the doctrine of substantial performance to this case. Why wouldn't a notice be important, though, to a lessor? Because a lessor could negotiate another lease. Could the lessor not? It seems to me that you're just sort of saying, eh, you know, you should be down at the courthouse looking at these things. Mailing doesn't really mean anything. But it seems to me that while it may not have been important to Chesapeake or its predecessor, that it arguably was very important to the Berghoffs. I think it would be hard in this specific case, Your Honor, to say it was important to the Berghoffs because we have, of record, the Berghoffs' admission in their depositions that they didn't have any idea what anything in paragraph 10 meant. So the idea that they were somehow relying on this notice doesn't really hold water because they stated in their depositions, we don't know what paragraph 10 means. We don't understand it. So the idea that they could rely on something which they said we don't understand doesn't really hold up. The other thing I would say, as Your Honor pointed out, is there is, in fact, constructive notice in this case, and there was notice mailed, again, not prior to the expiration of the primary term. So tell me here, when you talk about substantial performance in gross injustice, which of the parties have to show this? That the lease has been substantially complied with? I would imagine that it's Chesapeake's burden to show substantial performance. I think it would turn out that the plaintiff in Eastern Oil was Eastern Oil. Is that right? I'm trying to remember. I believe that what happened in Eastern Oil is actually the lessee brought suit because the former lessor had signed a new lease. And so I think that the—and I'm not exactly sure of the answer to your question, Your Honor, but I believe it was flipped, that in that case, it was actually the oil company that was bringing suit, trying to enforce what it believed was its existing lease. On gross injustice here, whether there was notice complied on the part of the lease, or was it the fact that there was substantial performance? And the question is whether that substantial performance by the defendant, your client, would amount to a gross injustice to not give him relief. I think to the extent that gross injustice is—I think it's the latter, Your Honor. To the extent that that is a requirement under the law, I think it would be the latter, Your Honor. Let's get back to the facts for a second. Are you saying there is no material dispute as to the reasonableness of Mr. Berghoff's denial of access, the particular access road chosen in this case? I think it's Chesapeake's and it's both of the defendant's position that Mr. Berghoff's actions absolutely were not reasonable. You're saying as a matter of law, they were not reasonable. I think Judge Bailey made the decision based on the facts, Your Honor. All right, but I'm asking you, what facts in the record make Mr. Berghoff's actions, denying access unreasonable as a matter of law, entitling you to summary judgment? So what Mr. Berghoff said in his deposition, and this is him, so this is from Mr. Berghoff's point, the guy from Chesapeake did tell me we have environmental problems because the way you, meaning Mr. Berghoff because he's speaking, want to put the road has to go, there is a creek there. Chesapeake works around creeks all the time. I, Mr. Berghoff, didn't see a problem. So that's when pretty much the well ended. So there's a dispute. One side says there's an environmental problem, Mr. Berghoff, in the way you want to go, and the other one says, no, I don't see a problem. So why isn't this a material dispute? I don't think it's a material dispute because you don't need to look at the reasonableness of Mr. Berghoff's behavior. What I would say is that the district court decided this case on three bases, operations on the property, operations on property with which the Berghoff property was pooled, and Mr. Berghoff's actions. I don't think you need to look at Mr. Berghoff's actions to find, one, that there were operations on the property, and, two, that there were operations on the property with which the Berghoff property was pooled. But if we were to look at that and suggest that that's material to this case, do we have a factual dispute? Again, I don't think you need to look at it. You're not answering the question. There's all these other bases. If you were to look at it, no, Your Honor, I don't think there's a factual dispute there. What Judge Keenan just talked about is, well, Mr. Berghoff says on the one hand that it's not an environmental problem. You say on the other hand it is. The problem is Mr. Berghoff also talked in his deposition about his background, his training, his education. He has none of those things which would allow him to make any kind of judgment about whether or not there was an environmental issue with where Chesapeake wanted to place the access road. On the other hand, for example, if we could look at the deposition of Mr. Branch, I imagine what we would find there is he talks about his background, his education, the things that allow him to set up a site for a well pad, the things that allow him to know, okay, there's probably an issue here. So it's not a factual dispute because it needs to be – there needs to be some kind of question there. Mr. Berghoff has no basis for his opinion whatsoever. So there's not a factual dispute there. It wasn't reasonable for him. Regarding the operation here. So Judge Bailey found it was being operated, the actual property. If we were to say, no, your client abandoned that operation on the actual property, is there still a basis for saying that it was being operated on the adjacent property? And if so, is it necessary to show it's being pooled to come to that conclusion? Or could it just be in search? And if so, then why do you need to reach the pooling? The answer to your questions are yes, it's absolutely possible to show that it was operated. That's what I was talking about with all the permitting that took place for the well that's underneath the property. That it was being operated and you don't need to show pooling. Yes, you don't need to show pooling for that operation. So what were the steps that you would say, because your attorney on the other side says, no, you hadn't done enough, so to speak, to show that you were intending to do this. That you'd only just done a few things there. What had you actually done at that point to show that you were operating in search of, or being operated in search of gas and oil? So there's two different things that answer that question, Your Honor. The first is the construction of the William Rogers well pad. That pad was constructed on property next door, but the AH well comes from that property next door, makes its turn, and comes directly onto the Burghoff property. So prior to the end of the primary term, that pad was permitted. They did all the various water searches they need to do. It was leveled. It was excavated, and construction began. Right, but it couldn't have. Excuse me. But had it actually reached into the property at that time? Drilling did not commence until. And it could not have until the pooling was affected. No, I apologize. No, no, no. Tell me why they could have gone underground to the Burghoff property. Pooling has to do with two separate things, Your Honor. It has to do with how we're going to allocate the royalties amongst everyone in the pool, and it has to do with whether or not we're going to hold the lease on properties which are not physically drilled. If we imagine a pool to look like a square, and let's say the wellbore starts from the very top, it might run directly through the middle of the square or the rectangle, right? There could be properties on the side over here which are not what we call wellbore tracts. The well does not physically penetrate those properties. However, the idea is we're still pulling gas from those properties, and so they're part of the unit. The second part of pooling, in addition to allocation of royalties, is we are going to – these leases are going to be maintained because we're pulling from them. In this case, the Burghoff property was one of those wellbore properties. All those operations took place with the idea that there was going to be a wellbore physically on the Burghoff property. And I realize I'm out of time. And you're saying it was approved to enter the Burghoff property before the lease expired? The 8H well was fully permitted. What's your appendix reference for that? I don't know if I can give you an appendix record. What I can represent to you is that the record shows, and I apologize, casing was approved, the wellwork permit was approved, and the plat was submitted, which there were two plats submitted. The second of which – The amended plat you're talking about? Yes, Your Honor. The first plat was September 1st. The second plat was, I believe, October 14th, about six weeks later. All of that, all of the – You're saying the amended plat showed what? The amended plat – The Burghoff property. Showed that the wellbore would reach the Burghoff property. Yes, Judge. Mr. McGraw, before you sit down, are you suggesting, maybe you can explain this, that because of the operations on the adjacent property that, under your theory of the case, doesn't that effectively – your theory that that was sufficient to extend the lease, doesn't that effectively eliminate the requirements of the pooling provision? I don't think you needed to pool in this instance for the Burghoff property. Then what work does the pooling provision do? The pooling provision kicks in if the property was to be one of those other properties I was talking about. So this idea that not all properties in the unit are physically penetrated by the wellbore, but they remain part of the unit. For those properties, you absolutely need a pooling provision. You don't believe that – your point is that the plaintiffs in this case had no understanding about the lease provision, but you don't think that it's a reasonable understanding that before any activity occurred in that adjacent property that there had to be compliance with the pooling provisions in this case? For this specific piece of property, no, Judge. I don't think that's required. Well, what was the point of the pooling provision with regard to the Burghoff property? Why does it even matter then, according to you? It doesn't. It's irrelevant. In this set of facts, I think it could become irrelevant. The reason it's there is because the lease was signed and gives Chesapeake, or whoever the lessee is at that point, a five-year period to develop. Yeah, but talk more slowly maybe and simple English. Why does it matter in this case whether it was pooled or not if they could do it without pooling and they allegedly did it in October of 2011 by filing the amended plat? I don't think it matters if it was pooled because there's operations on the property. You're saying that's just a red herring in the case, whether it was pooled or not. I think it was properly pooled, but it didn't need to be. If I understood, the lawyer on the other side, if I understood what he said was that it could, in fact, be used in that manner to operate from a separate piece of property without going into the pooling. But in this instance, the problem was you hadn't done enough, and you say you have done enough because preparations in search is sufficient because it satisfies the searching for all. I think that's absolutely right, Your Honor. But under your view of the case, if you didn't think the pooling provision had any impact, then why comply with it? Well, Your Honor, it certainly makes things easier if we can get that pooling there. The other thing is what pooling allows us to do is, in part, be transparent, show this is what we're doing, these are the operations that we're taking. It's one of the reasons why it's recorded and why it's a matter of public record. And we need that pool for everybody. Like I said, you need that pool for everybody who's involved outside of those wellbore tracks, and so this pool shows them kind of what's going on and what's happening. Thank you for your time. All right, sir. Thank you. Okay, Mr. McGraw, you understand what the problem here is. Is pooling necessary in this case? You're going to say yes, but what about their argument? Mr. Liebman is saying that they were coming in from the adjacent property and they were conducting or planning an operation on the Berghoff property because they were going to get in underground. Why isn't that enough? Because I think the lease agreement only gives them the right to operate my client's property if they're physically on my client's property. What about the lease does that? The abendum clause requires them to operate the premises, the actual production of gas, capable of production gas, operate in the search of oil and gas. And I think what Judge Keene and Judge Diaz were kind of pointing out, which I kind of inartfully tried to explain to Judge Winn when we were explaining this before, when you get to the other property, is without that pooling clause, you can't come from another person's property and enter our property. Without that pooling clause, your operations have to physically be on my property. How do we know that? You're saying that to me, and it makes a heck of a lot of logical sense. The rule of capture is an oil and gas law in most all oil and gas producing states, clear in West Virginia, that if the well is on your property and the gas is being produced from your property, you get it all, no matter where that gas is coming from. Once you're drilling and operating gas from other properties, you get into this idea of how do you calculate, how do you allocate, how do you determine the sharing of the royalties. As Mr. Lehman said, pooling relates to the sharing of these royalties that are coming through. If you've got that well on the Rogers property that may transverse part of the Burghoff property, you're necessarily going to have to go into some calculation as to how you share, how you allocate these royalties among the different properties which are being operated through the Rogers well. The pooling clause is how you get to that point. If you haven't effectuated the pooling property properly, you don't have the right to enter the Burghoff property from someone else's property where you're going to be sharing royalties with other landowners, other mineral owners who have not participated. And the rule of capture is something that has not been briefed in the case. It is an issue that's just come up through this. But there's at least a distinction. As you say, the physical presence is required on the actual property. It is to begin the search, but to operate is a different matter. You could be on this separate property, pooling or no pooling. If you extend a line to the other piece of property and begin operating by extracting oil, are you in the search of it? Why do you need pooling? You would need pooling, and pooling in West Virginia is required. There is no right of pooling under West Virginia law in terms of integrated leases. My question is you don't need pooling. So, as I understood, your argument against this is not that the pooling is required, but that there was not enough to establish there was being operated in search of oil from the separate property. I think my argument is both. I think that in this case, the operations in search of— Well, both, if you can show that. If you can simply say that it's not being operated in such. But the question is, is it necessary to have a pooling in order to operate from an adjacent property in search of oil on this property? In other words, can you do it without physical presence? You don't have any case law that says that. This contract doesn't say this. You use this word search to go look in a dictionary and try to go in that direction. But that search you're using is used as a noun. That's not used as a verb searching for it. And so searching can be done from the adjacent property whether you pool or not. That's true, although you say it's not being done here because you're not actually operating. Yes, so it's not enough because the leg is not being drilled. Nothing is actually happening. There's always the risk that you have a dry well. There's even a paragraph 7 in this lease that talks about what happens if we drill this well and we don't find any gas. So the nub of this comes down to are preparations to search sufficient or do you actually have to be drilling, which is what your contention is? My position is you actually have to be drilling under search as it's used in this lease agreement, which is different from commencement of operations, which could be preparation under Fleming. Very quickly, Eastern Oil, lots of differences between the Eastern Oil case. In that case, they actually found gas before the lease expired, decided they were going to drill farther to try and get more gas that might be more profitable, and the landowner did physically come to the drill site and physically stop the workers from completing that second well. And then the second well was finished only within 12 hours when the lease would have expired. So I think there's a big factual difference there between those cases. So thank you very much, Your Honors. I appreciate the opportunity to be here today. It's always an honor. All right. Thank you very much. We'll come down and greet counsel and then come back up on the bench and take our next case.
judges: Barbara Milano Keenan, James A Wynn Jr., Albert Diaz